NICKLAS v. CROWELL et vir.

No. 34268.   Oct. 16, 1951.

Rehearing Denied Dec. 11, 1951.

238 P. 2d 347.

Charles E. Dierker and George Miller, Jr., Oklahoma City, for plaintiff in error.

Mark Ingle and John Barry, Oklahoma City, for defendants in error.

HALLEY, V. C. J. This is a controversy between a mother and her oldest daughter. Mrs. Emma Nicklas was the mother of nine children. The oldest child, Alma Nicklas, now Crowell, was living in a rented house in Oklahoma City with her mother and four or five minor children in 1944, when the transaction here involved occurred. Mrs. Nicklas had been separated from her husband for several years, but not divorced. Alma had regular employment.

She paid her mother $5 per week for her room and board. Mrs. Nicklas had no regular earning capacity, but had secured an order for her husband to pay her $80 per month for child support, and had an allowance of $80 per month from sons in the armed service. Mrs. Nicklas also earned a few dollars occasionally.

The landlord gave Mrs. Nicklas a 90-day notice to vacate. This period was about to expire, and he refused to extend it. They found no house suitable to rent, but did find the house in controversy for sale at $5,000, with $1,000 as a down payment. They did not have the $1,000. They talked to Mrs. Nicklas' married daughter, Mrs. Loretta Briece, who had no home of her own, but she and her husband owned an automobile. It was suggested that Loretta and her husband mortgage their car to obtain enough money for the down payment on the house. Loretta agreed, and secured a loan of $750 on the car. Mrs. Nicklas gave Alma $75 in cash to deposit with the owner of the house as earnest money. Alma and Loretta went to the F.H.A. rperesentative, who arranged for an insured loan to cover the balance of $4,000 on the purchase price. Upon advising the agent of their financial circumstances and the urgency for a prompt loan, Alma and Loretta were told that since their mother had no earning capacity they had better take title in the name of Alma, who was regularly employed, since the loan would more likely be made to her than to Mrs. Nicklas and would be made more promptly if taken in Alma's name. The daughters did not want their estranged father in the transaction. These facts were made known to Mrs. Nicklas, and she agreed to the suggested method of purchase.

Alma signed the application for an insured F.H.A. loan. The rules required that no other loan be against the property and that no additional obligations exist other than the insured loan. Alma was required to secure and file a "gift letter" from Loretta, stating that the $750 advanced by Loretta and her hus-

band was a gift to Alma. Alma agreed with Loretta that she would repay her the $750 in installments. The application for the loan also recited that Mrs. Nicklas would live with Alma, and that her annual income was $960. Mrs. Nicklas appears to have left the loan matter entirely to her two daughters. Certain loan expense accrued, part of which was paid by Alma, making her outlay approximately $1,000. Some minor repairs were required before the loan could be completed, and Mrs. Nicklas claimed that she paid $138 for these repairs, but Alma claimed that she paid most of that amount.

Alma, her mother, and the minor children moved into the new home in April of 1944. Alma turned the deed over to her mother, who placed it among her private papers. Alma paid nothing further for room or board, but began to pay Loretta installments on the $750. Mrs. Nicklas made the loan installment payments, which included taxes and insurance, and had paid $1,333 at the time this suit was filed. A little more than a year after the house was purchased, Alma was married and established a separate home, leaving the deed to the property in controversy with Mrs. Nicklas. Alma testified that nothing was said about conveying the home to her mother until November of 1947, when her mother mentioned that she would repay Alma what she had paid on the house and would like to have title in herself so she could claim the homestead exemption. Alma replied that she "would see about it."

In August of 1948, Mrs. Nicklas, having obtained $1,000 from one of her sons, went to the home of Alma with a deed from Alma and husband to Mrs. Nicklas. Alma and husband refused to execute the deed for less than $2,000 because the property had advanced in value.

Upon the refusal of Alma and husband to convey to Mrs. Nicklas,. this action was filed by Mrs. Nicklas. The court found for the defendants, and Mrs. Nicklas has appealed. She claims that the court erred in failing to declare a resulting trust in her favor and award her the property involved, and in excluding certain testimony offered by her through her witness Harold Briece, to the effect that he and Loretta borrowed the $750 on their car to buy the home for Mrs. Nicklas and would not have borrowed money to apply on the purchase of a house for Alma. We shall consider these questions in the order named, and shall refer to the parties as they appeared below, or by name.

Resulting trusts are declared by sec. 137, 60 O.S. 1941, as follows:

"When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

It is well established by the decisions of this court that a resulting trust may be established by parol. In the early case of Flesner v. Cooper, 39 Okla. 133, 134 P. 379, it is said in Syllabus (1):

"Resulting trusts are those which arise where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition, or from accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title. In such a case, a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner."

In the later case of Fibikowski v. Fibikowski, 185 Okla. 520, 94 P. 2d 921; Id., 190 Okla. 152, 121 P. 2d 304, the court quoted from Babcock v. Collison, 73 Okla. 232, 175 P. 762, wherein it is said:

" 'A resulting trust may be established by parol evidence, but the law requires that the proof necessary to establish it should be of the most satisfactory kind. The onus of establishing a resulting trust rests upon him who seeks its enforcement, and before a

court of equity will be warranted in making a decree therefor, the evidence must be clear, unequivocal, and decisive."

In Johnson v. Johnson, 201 Okla. 268, 205 P. 2d 314, it is said in the third syllabus:

"A finding or decree of the trial court of the existence of a resulting trust based upon oral evidence as to the facts and circumstances will not be disturbed upon appeal where the evidence with reference thereto is clear, unequivocal, convincing and decisive."

Measured by the foregoing rules, is the evidence sufficient to establish a resulting trust in the land involved in the plaintiff, Mrs. Emma Nicklas? There is little in writing to prove the intention of the parties, other than the application for the F.H.A. loan and the deed to Alma Nicklas. There are some receipts for money paid in completing the purchase of the house, but there is a conflict in the evidence as to who made all of the payments. We must look to parol evidence and the facts and circumstances surrounding the transaction and the relationship of the parties in determining whether or not a resulting trust should be declared.

Alma Crowell testified that the property was to be hers, and that she never made any agreement that she would transfer the title to her mother upon receipt of the amount that she had advanced in payment of the purchase price. Mrs. Nicklas testified as follows:

"Q. And what was that conversation? A. Well, I took her the money and I said: 'I would like to have the title.' She said: 'No, I won't give you the title.' She said: 'I want another thousand dollars.'

"Q. Did she say why she wanted another thousand dollars? A. The property had increased in value.

"Q. Was there anything more said? A. Well, that was all, the property had increased and she wanted another thousand dollars.

"Q. Did you say anything to her? A. I said I wouldn't give it to her.

"Q. Why? A. I didn't have it and I—it was understood, if I would ·give her the thousand, she would give me the title.

"Q. Did you tell her that, at that time? A. Yes, sir.

"Q. What did she say to that? A. She said No, she wouldn't give it to me.

"Q. Did she make any demand upon you at that time, about you and the children vacating the property? A. No, sir."

Alma testified in regard to that conversation as follows:

"Q. And now, coming down to the conversation that your mother testified to shortly before this lawsuit was filed, will you please tell Judge Melone just what was said there by you and what was said by your mother? A. Well, she called and asked if we were going to be home and she came out, sat down in the rocking chair and she threw a paper over to me and she said: 'I want you to sign this.' I read it; it was a deed of myself and my husband, Doctor Crowell, deeding this property at 612 Northwest 34th Street to Emma Nicklas, a single woman, and I says: 'No, I want to keep the property.'

"Q. What else was said? Now, I have reference to the deed they wanted; tell the court everything that you said and that your mother said and if your husband said anything, in that conversation, in your mother's presence, tell that also; just tell the whole conversation. A. Well, my husband also read the deed and he says: 'Well, I refuse to sign it,' and I says: 'Well, since this has come up, I think the property has increased in value and for everything, I think I should have two thousand dollars.'

"Q. What was said then? A. She says, 'I refuse to pay you two thousand dollars.'

"Q. Well, go ahead; what else was said? A. I said, 'Well, if that's the way you feel about it, why, that's all right with me.' "

The other daughter, Loretta, testified in part as follows:

"Q. All right. Now, what was said with reference to the purchase of a

home and who said it, just as nearly as you can recall the conversation? A. Alma and mother both told me that it took a thousand dollars to make a loan, I mean, to buy this home that we wanted to buy, and the question came up as to where we could get this thousand dollars, and Alma asked me if I could get a loan on our car, and I said it would be up to Harold, I would have to talk with him about it and I didn't know yet how much or anything we would need, then, before going into it, until I should know if they were going to raise the rest of the money and then, if they could do that, we would be willing to mortgage our car for a home for mother.

"Q. Did you tell them that? A. Yes, and definitely known that I would mortgage the car only for a home for mother.

"Q. Did you tell them that you would mortgage your car for the purpose of buying a piece of property for Alma? A. No, sir.

"Q. Did you ever tell Alma or your mother or anybody else that? A. No, sir.

" . . .

"Q. Now, what was said there between you and your sister and Mr. Purdy? A. We stated our case to Mr. Purdy about buying this home for mother and he said it was a very small chance of the loan being approved, for several reasons: one of them was that it couldn't hardly be approved in mother's name because she had no earning capacity. Another was that she had to move in a certain length of time and it would be closed sooner in Alma's name because she was working at that time.

" . . .

"Q. How did the question of how the title was to be taken come up, if it did come up; who asked the question and who said what? A. Well, Mr. Purdy asked us how the title would be taken on the property if we got the loan and we said we didn't know that it was being bought for a home for mother; what would he suggest? He suggested that it be put in Alma's name.

"Q. Now, did he ask Alma if she had any money? A. Yes, sir.

"Q. What did she say? A. She says: 'I have a few dollars to pay down on it.'

"Q. Did she tell him where she got it? A. Yes, sir, she told him where she got it and he said, well, that I would have to sign a statement that I was giving her that thousand dollars, because if she had a mortgage against her name the loan might not be clear in her name."

Mrs. Nicklas testified that Alma had always said that she would give her a deed to the land when her mother paid her the $1,000 advanced toward its purchase. Alma admitted that her mother had made all the payments on the $4,000 F.H.A. loan, but claims that these payments were made in lieu of rent. Mrs. Nicklas admits that Alma advanced $1,000 on the purchase price, but claims that she tendered this sum to Alma in August, 1948, and that Alma refused to accept it, but demanded instead $2,000.

The pertinent facts and circumstances to be considered are: That in 1944 Alma had no home except that with her mother; that she paid her mother $5 a week for her room and board until the property involved was purchased in 1944, after which time she paid her nothing; that the property was taken in Alma's name at the suggestion of the F.H.A. agent, in order to make the loan more prompt and certain; that when Alma obtained the deed to herself she immediately turned it over to her mother, and left it with her mother long after she had married and moved into a home of her own; that Alma could think of no one to whom she had ever stated that she owned this property; that she apparently paid no attention to the property, and allowed her mother to spend over $900 on it, mostly for permanent improvements, and made no offer to repay her for such expenditures; that Loretta, who borrowed $750 on her car to help make the down payment, testified that it was understood by all of

them that the home was to belong to their mother; that Loretta's husband offered to testify that his purpose in mortgaging his automobile was to raise money for the down payment on a home for Mrs. Nicklas, and that he would not have borrowed money to buy a home for his sister-in-law, Alma; that Alma admitted that she offered to give her mother a deed for $2,000 in August of 1948, "because the property had increased in value." This to us is an implied admission by Alma that it was intended by her that the home was being purchased for her mother, and that she was obligated to give her mother the title to the property whenever her mother reimbursed her for the $1,000 admittedly advanced by Alma. We have also considered the fact that when Alma refused to give her mother a deed upon the payment of $1,000, she did offer to execute a deed if her mother would pay her $2,000. She advised her mother at that time that she had been offered $8,000 for the property, and Mrs. Nicklas made no request for any part of the profits from such a sale, but suggested to Alma that perhaps she (Mrs. Nicklas) would be able to rent the house from the purchaser, and was then advised by Alma that the prospective purchaser wanted possession himself. The suggestion by Mrs. Nicklas that she rent the house from the purchaser can only be understood as a desperate effort to provide shelter for herself and her minor children. She knew that the title stood in Alma's name, and Alma had just refused to convey to her mother unless she paid her $2,000, a sum beyond the reach of Mrs. Nicklas.

It must be kept in mind that Alma and Loretta went to the F.H.A. office with the admitted intention of acquiring a home for their mother and her minor children. It was clearly at the suggestion of the F.H.A. representative that title was taken in Alma's name. It was so taken to insure certainty and promptness in securing the loan. Loretta testified definitely that she and her husband, who themselves had no home,

mortgaged their car for the purpose of making a down payment on a home for her mother, and that such fact was "definitely known" to the others.

On page 3 of defendant's brief is a statement that Mrs. Nicklas agreed with Alma to keep the property in a reasonably good state of repair. We find no evidence whatever in the record to support such a statement.

It is contended by defendants that Mrs. Nicklas made no legal tender of the $1,000 to Alma. There is no merit in this contention. It is not disputed that Mrs. Nicklas had the cash and offered to pay it to Alma if she and her husband would sign the deed to Mrs. Nicklas. In Janeway v. Vandeventer, 172 Okla. 379, 45 P. 2d 79, this court announced the rule in regard to tender as follows:

(Syl. 2): "Where a tender is necessary to the establishment of any right against another party, it is waived or becomes unnecessary when it appears that such tender, if made, would have been refused."

Here, the tender was admittedly refused by Alma. There was no necessity for Mrs. Nicklas to show Alma the currency, nor to do more than she did, to effect a legal tender.

It is also contended that plaintiff cannot enforce the agreement in controversy because it was illegal and contrary to the provisions of the National Housing Act. Alma made the application to the F.H.A. and presented a "gift letter" from Loretta to Alma, who knew that such statement was untrue. It is no defense that the obligation to repay Loretta was merely moral and not legal. Under the provisions of the National Housing Act, Loretta could not have enforced collection. Mrs. Nicklas had nothing to do with this transaction. She was informed that Loretta and Alma were obtaining the loan, but she took no part in the transaction. Alma and Loretta handled all of the loan transactions. The agreement between Mrs. Nicklas and Alma was not illegal.

The plaintiff offered to prove by Harold Briece, her son-in-law, that he mortgaged his car for money to help buy a home for Mrs. Nicklas, and would not have mortgaged it to help buy a home for his wife's sister Alma, who was a young single woman, regularly employed, and able to look after herself. This testimony is in substance about the same as that of Loretta, and was rejected on the ground that the witness did not disclose his thoughts or intentions to Alma, the party here sought to be bound by the alleged resulting trust. We think his testimony should have been admitted as disclosing the intention and understanding of the witness in lending his aid to the purchase of the home.

It is claimed that Alma advanced most of the consideration to buy the home. This is incorrect. She did advance most of the down payment, but only through the generous aid of Loretta and her husband in mortgaging their car and making a "gift" of $750 to Alma. It is true that Alma repaid this sum to Loretta, but Alma had a home for over a year without paying board. At the time of the trial Mrs. Nicklas had paid $1,333 on the F.H.A. loan and had spent $904.23 on improvements, most of which were permanent, and it was admitted that she gave Alma $75 to deposit as earnest money when the transaction was first made firm; so that Mrs. Nicklas had invested in the property over $2,300, while Alma had advanced only $1,000 toward its purchase. Alma did not deny these facts, but claimed that her mother was reimbursed by free rent. If the property was bought for Mrs. Nicklas, she owed no rent.

. The fact that Alma never claimed to her mother that the property was bought for herself, and that she offered to execute the deed to her mother upon the payment of $2,000 because the value of the property allegedly had increased to $8,000, constitutes positive proof that Alma knew that the home was purchased for her mother, and an acknowledgment of her obligation to convey, and that she only wanted to share in the rapid increase in value of the property. The testimony of Mrs. Nicklas and of Loretta Briece, when considered with all of the facts and circumstances surrounding the transaction, constitutes clear, convincing and unequivocal evidence of the most satisfactory kind in support of the plaintiff's claim that it was the intention of the parties that the beneficial interest was not to rest with the grantee in the deed, but was intended to be enjoyed by her mother, Mrs. Nicklas; and the finding for the defendants is clearly against the weight of the evidence.

. The judgment is reversed, with instructions to enter judgment for the plaintiff for the land involved, possession thereof, and quieting title thereto in the plaintiff, upon the payment to the defendant Alma Nicklas Crowell of the sum of $1,000.